*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

XT, Minor, by Next Friend AMBER TOWER, and
JASON TOWER,

       Plaintiffs-Appellants,

v

FLATROCK MANOR, INC.,

       Defendant-Appellee.

UNPUBLISHED
November 30, 2023

No. 364071
Genesee Circuit Court
LC No. 21-115409-NO

Before: O'BRIEN, P.J., and K. F. KELLY and M. J. KELLY, JJ.

PER CURIAM.

Plaintiffs, XT by next friend Amber Tower, and Jason Tower, appeal as of right the trial court's opinion and order granting summary disposition in favor of defendant, Flatrock Manor, Inc. We affirm.

## I. BACKGROUND

The pertinent facts of this case are largely undisputed, but to the extent they are disputed, this opinion will recount the facts in the light most favorable to plaintiffs as the nonmoving party.

Defendant operates 27 foster care homes for adults with mental illness or developmental disabilities. At the time of the relevant events, 25-year-old Katie Rameau was a resident at one of defendant's facilities. By way of background, Rameau was diagnosed with "a mild intellectual disability and an autism spectrum disorder." She "had a long history of problematic behavior, particularly in the form of aggression, property destruction, and self-injury." The physical aggression Rameau had demonstrated included "hair pulling, biting, scratching, hitting, and kicking." Rameau's behavioral problems also "included escape." Staff responsible for Rameau was trained in various techniques to handle Rameau's problematic behavior. One such technique was "blocking," which was accomplished by staff placing themselves between Rameau and any person she was targeting. Rameau frequently went on outings in the community, and while she had never been aggressive towards a member of the public, staff were still advised to monitor Rameau "while in the community to ensure constant safety."

Defendant's employee Jacquetta Green worked at the facility that housed Rameau. Four residents resided at the facility, and two staff members worked each shift. Nicholas Burnett, the owner and CEO of defendant, testified that defendant "would like more than one staff at all times."

On October 28, 2020, Green was working in the home with Sherry Wooster. While Wooster was away from the facility with the other residents, Green was at the facility with Rameau. At around 4:45 p.m., Green was upstairs doing paperwork while Rameau was downstairs listening to music. According to Nathan Hank, the facility's home manager, certain types of music, particularly "heavy metal music" or "rock music," were "known triggers" for Rameau, though he also believed that "all music could be a trigger" for Rameau depending on her "mood." While Green was still upstairs, she heard Rameau's music stop playing and then heard the alarm from the door leading outside. The door had a keypad that staff used to open the door, but it could also be opened via "delayed access," which allowed the door to be opened by pressing on the door handle for 15 seconds. Doing this automatically unlocked the door and caused an alarm to sound.

When Green heard the alarm, she went downstairs, and as she reached "the last step" she saw Rameau exiting through the door. Green followed Rameau to try to calm her down and get her to return home, but Rameau refused, so Green continued following her.

Jason and his two sons—three-year-old XT and XT's younger brother, ET—were walking through their neighborhood when Rameau approached them. Jason did not initially see Green with Rameau, but eventually heard Green tell Rameau that she needed to go back to the house because she did not have her shoes, at which point Jason saw that Green was about 20 feet behind Rameau. Jason did not think it unusual that Rameau approached his family because they often interacted with members of the community while on walks. However, when Rameau talked to ET, she got closer to him than Jason was comfortable with, which caused Jason to pick up ET and try to greet Rameau himself. Jason estimated that Green was still 10 feet away at this point, and he heard Green say to Rameau "stop, stop. You can't do that." Then, without warning, Rameau took a step towards XT, picked him up, and threw him on the sidewalk. Green gave Jason no warning, and Rameau acted too quickly for Jason to stop her. Jason saw XT's entire body hit the sidewalk; his back hit first, and then "his head snapped back" and the back of his head hit the sidewalk.

After XT was attacked, Jason immediately picked up XT with his free hand and carried both of his boys away from Rameau until he set them on the grass "probably like a property length" away from Rameau. When Jason looked back, he saw that Green was in a physical confrontation with Rameau. Green was eventually able to get Rameau back to defendant's facility after another one of defendant's employees pulled up in a vehicle and the two staff members got Rameau in the car.

When Jason brought XT home, he was conscious but extremely disoriented, so his parents brought him to the emergency room. XT was diagnosed with a skull fracture and a concussion. Hospital staff initially thought surgery would be required, but it was ultimately determined that no surgery was necessary. XT had to stay in the hospital overnight and was discharged the next day.

While Jason was not treating with a doctor or therapist following the accident, he testified that the physical responses he has experienced as a result of witnessing Rameau attack XT included "having a pit in your stomach," "crying," "racing thoughts," and "a sense of heightened alter

anxiety." He was also seen by Dr. Gerald Shiener, who opined that Jason suffered from posttraumatic stress disorder "with secondary depression" as a result of witnessing the assault of XT. Dr. Shiener further opined that Jason "has been significantly traumatized by the experience" and was "in need of a comprehensive program of supportive psychotherapy."

On March 18, 2021, plaintiffs filed the complaint giving rise to the instant action. In Count I, plaintiffs alleged that defendant was negligent, and that XT was injured as a result of defendant's negligent actions. In Count II, plaintiffs alleged that the defendant was liable for negligent infliction of emotional distress (NIED) based on Jason witnessing Rameau's assault of his son.

On September 12, 2022, defendant filed two motions for summary disposition, one with respect to each count in plaintiffs' complaint. For Jason's claim for NIED, defendant argued that plaintiffs had failed to offer sufficient evidence establishing a question of fact about whether Jason suffered an "actual physical injury" because all of the injuries that Jason suffered related to emotional harm, which was insufficient to sustain an NIED claim as a matter of law. For plaintiffs' claim of negligence, defendant argued that it must fail because defendant did not owe XT a duty. Defendant conceded for purposes of its motion that it had a special relationship with Rameau, but contended that this did not give rise to a duty to XT because it was not reasonably foreseeable that XT would be endangered by Rameau. Defendant noted that Rameau had never had any interaction with XT and never communicated any type of threat towards XT. Defendant more generally contended that Rameau's actions were unforeseeable because Rameau had never acted aggressively or violently towards any member of the public when she was out in the community.

In response to defendant's motion with respect to Jason's NIED claim, plaintiffs contended that the injuries Jason suffered were sufficient to establish at least a question of fact whether he suffered "actual physical harm." In response to defendant's motion with respect to plaintiffs' negligence claim, plaintiffs argued that defendant owed a duty to XT because it had a special relationship with Rameau and it was reasonably foreseeable that Rameau would act aggressively towards anyone she encountered (including XT) based on her history of aggressive behavior, particularly when "triggered and agitated" like she was when she left the home. Plaintiffs alternatively argued that defendant had assumed the contractual duty to supervise Rameau, and it had performed that duty negligently, which resulted in injury to XT.

The trial court held a hearing on defendant's motions and took the matter under advisement. Eventually, in a written opinion and order, the trial court granted defendant's motions. Viewing the evidence in the light most favorable to plaintiff, the trial court assumed that Rameau "had behavioral problems, which included a known propensity for violence, and that Defendant failed to take proper precautions to prevent her from being loosed in the neighborhood." Even so, the trial court concluded that defendant did not owe XT a duty. The court based its reasoning almost exclusively on *Swan v Wedgwood Christian Youth & Family Servs, Inc*, 230 Mich App 190; 583 NW2d 719 (1998), which will be discussed at length below. Essentially, the court reasoned that the instant case was analogous to *Swan*, that the facts in *Swan* "were much more egregious" than this case, and that if the facts of *Swan* did not give rise to a duty (as this Court concluded), then the facts of this case likewise did not give rise to a duty. For Jason's NIED claim, the trial court reasoned that defendant owed no duty to Jason for the same reasons that defendant owed no duty to XT.

This appeal followed.

## II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo. *McMaster v DTE Energy Co*, 509 Mich 423, 431; 984 NW2d 91 (2022). Defendant moved for summary disposition under MCR 2.116(C)(10). Summary disposition under MCR 2.116(C)(10) is proper when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013).

The initial burden in a motion under MCR 2.116(C)(10) rests with the moving party, who can satisfy its burden by either (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996) (quotation marks and citation omitted). In response to a properly supported motion under MCR 2.116(C)(10), the nonmoving party cannot "rest on mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial." *Campbell v Kovich*, 273 Mich App 227, 229; 731 NW2d 112 (2006).

## III. ANALYSIS

Plaintiffs argue that the trial court erred by concluding that defendant owed no duty to XT. We disagree.

To establish a cause of action for negligence, a plaintiff must establish four elements: (1) the defendant owed a legal duty to the plaintiff; (2) the defendant breached that duty; (3) the defendant's breach of that duty proximately caused an injury to the plaintiff; and (4) the plaintiff suffered damages. *Lorencz v Ford Motor Co*, 439 Mich 370, 375; 483 NW2d 844 (1992). "A negligence action may only be maintained if a legal duty exists which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Riddle v McLouth Steel Products Corp*, 440 Mich 85, 96; 485 NW2d 676 (1992). Whether the defendant owed a duty to the plaintiff is a threshold issue that must be decided by the court as a matter of law. *Marcelletti v Bathani*, 198 Mich App 655, 659; 500 NW2d 124 (1993).

"Duty is actually a question of whether the defendant is under any obligation for the benefit of the particular plaintiff and concerns the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other." *Buczkowski v McKay*, 441 Mich 96, 100; 490 NW2d 330 (1992) (quotation marks and citations omitted). "Generally, an individual has no duty to protect another who is endangered by a third person's conduct." *Marcelletti*, 198 Mich App at 664. Such a duty may arise, however, "where one stands in a special relationship with either the victim or the person causing the injury." *Jenks v Brown*, 219 Mich App 415, 421; 557 NW2d 114 (1996). Here, we assume without deciding that defendant stood in a special

relationship with Rameau (the person causing the injury).[1]  When a special relationship exists, a duty of reasonable care is owed only to third parties who are who are "readily identifiable as foreseeably endangered."  *Swan*, 230 Mich App at 200, quoting *Jenks*, 219 Mich App at 421, quoting *Marcelletti*, 198 Mich App at 665 (quotation marks omitted).

In our opinion, nothing in the record supports that XT was "readily identifiable as foreseeably endangered" by Rameau.  Plaintiffs cite evidence showing that Rameau had a history of "problematic behavior"—which included "hair pulling, biting, scratching, hitting, and kicking"—that defendant was aware of this behavior, and that defendant's staff was trained on how to address this behavior.  But none of this made *XT* "readily identifiable as foreseeably endangered."  There is no evidence that Rameau had ever interacted with XT before October 28, 2020, let alone evidence that Rameau had acted violently towards XT or threatened XT in any way before she attacked him on October 28, 2020.  The only reasonable conclusion to draw from this evidence is that no foreseeable danger to XT was made known to defendant while Rameau was in defendant's care.  Accordingly, defendant did not owe XT a duty to protect XT from Rameau.

This conclusion is amply supported by this Court's decision in *Swan*, as the trial court reasoned.  The facts of *Swan* are egregious, as recounted by this Court:

> This case arises out of the killing of sixty-nine-year-old Harry Washington Swan by his live-in girlfriend's sixteen-year-old son, Clyde LaPalm.  LaPalm had a long history of behavioral problems, including violent and assaultive conduct, self-mutilation, and several suicide attempts.  He had been arrested six or more times for petty theft, grand theft, damaging property, and assault.  On June 10, 1992, LaPalm was admitted to a psychiatric hospital after he took an overdose of the prescription drug Tegretol in an attempt to "get high."  On June 29, 1992, he was the subject of juvenile proceedings arising out of charges of retail fraud, assault and battery, and malicious destruction of property.  The probate court ordered that LaPalm continue as a temporary ward of the court and placed him in a juvenile

---

[1] On appeal, defendant contests for the first time that it did not have a special relationship with Rameau.  However, because defendant explicitly conceded that it was not disputing the existence of a special relationship between defendant and Rameau for purposes of its motion for summary disposition, we consider this argument waived for purposes of deciding defendant's motion for summary disposition.  See *Reed Estate v Reed*, 293 Mich App 168, 176; 810 NW2d 284 (2011) (explaining that "at its most basic, a waiver is the intentional relinquishment of a known right that may be shown by express declarations or by declarations that manifest the parties' intent and purpose") (quotation marks, citations, and alterations omitted).  Moreover, as a result of defendant explicitly conceding that a special relationship existed, the issue was never raised before the trial court, so it is unpreserved.  *Glasker-Davis*, 333 Mich App at 227.  Because this is a civil case, this serves as another basis to consider the issue waived.  See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2023); Docket No. 359090, slip op at 2-5 (explaining that the "waive or raise rule" applies in all civil cases, meaning that, in a civil case, any issue not raised before the trial court is considered waived on appeal).

detention center until July 8, 1992. On July 9, 1992, LaPalm was turned over to the county Community Mental Health Department (CMHD) for placement.

LaPalm was transferred to defendant's facility on July 16, 1992. Defendant ran a "secure residential program," which specialized in adolescents who had serious emotional or behavioral problems and were difficult to place. LaPalm's intake referral form noted his past placements that resulted from his aggressive conduct or destruction of property and indicated a history of "some assault." The consulting psychiatrist diagnosed LaPalm with oppositional defiant disorder and bipolar disorder in full remission. Thereafter, an "Initial Service Plan" was prepared, which indicated that LaPalm was progressing well and had demonstrated a strong desire to complete treatment and resolve his inability to control his anger. The plan also stated that LaPalm's mother and the decedent, her live-in boyfriend, had visited him twice since his admission. Because those visits went well, LaPalm's mother and representatives from defendant and the CMHD agreed that LaPalm could visit his mother's home from August 21 through August 26.

LaPalm traveled by bus to visit his mother as planned on Friday, August 21, 1992. LaPalm testified in a deposition that on the evening of Sunday, August 23, he unsuccessfully tried to set fire to a truck and then a house using gasoline. Afterward, he went home and jumped out of a second floor window because he was depressed and wanted to hurt himself. His mother called defendant's facility, and both she and LaPalm spoke to a youth treatment specialist about the incident. Defendant's employee did not believe that LaPalm required immediate psychiatric attention, and he and LaPalm agreed to discuss the incident further when LaPalm returned to Wedgwood.

Shortly after the telephone call, LaPalm went outside, poured gasoline over his head, and lit himself on fire. He put the fire out after a few moments and went back inside the house. The decedent told LaPalm to "calm down" and put his hand on LaPalm's shoulder. At that point, LaPalm began punching the decedent, and the decedent fell to the floor. LaPalm then dropped a microwave oven and a television on the decedent. According to the autopsy report, the decedent's immediate cause of death was blunt trauma to the head with massive underlying cerebral hemorrhage and contusion. LaPalm was charged with open murder and pleaded guilty but mentally ill to a charge of manslaughter. According to plaintiff, LaPalm is serving a ten- to fifteen-year sentence at a prison psychiatric hospital. [*Swan*, 230 Mich App at 191-193.]

The plaintiff—the personal representative of the decedent's estate—sued the defendant under a variety of theories of negligence, but the trial court dismissed the plaintiff's claims, reasoning that the defendant "owed no duty to unknown third parties, such as the decedent." *Id*. at 193-194.

On appeal, the plaintiff argued "that [the] defendant did owe a duty of reasonable care in supervising LaPalm's home visit." *Id*. at 194. To address this argument, this Court explained that, in the context of a facility treating a mentally-ill patient, the facility-defendant's duty to third parties only extended to "those third parties who are readily identifiable as foreseeably

endangered." *Id*. at 200 (quotation marks and citations omitted). Applying that rule to the facts of *Swan*, this Court explained:

> In the present case . . . no foreseeable danger to plaintiff's decedent was made known during defendant's treatment of LaPalm. Nor did LaPalm communicate any threat of violence against the decedent or any other persons, except himself. Under these circumstances, defendant had no common-law duty to warn or protect the decedent. [*Id*.]

We agree with the following summation the trial court gave for why *Swan* supports granting summary disposition in favor of defendant in this case:

> The facts in *Swann* [sic] were much more egregious than in the instant case—LaPalm was clearly more dangerous that [Rameau], and Washington [the decedent], despite his known presence in the household, was not determined by the [C]ourt to be . . . foreseeably in danger because LaPalm didn't "communicate any threat of violence against [him]." Yet the [C]ourt found there to be no duty owed. If *Swann*'s [sic] facts don't pass the appeals court's muster in order to find a duty to protect, how can Plaintiffs hope to do so in the instant case? The obvious answer is, they can't. Pursuant to *Swann* [sic], the Towers were not "readily identifiable as foreseeably endangered," and thus not owed a duty by Defendant.

On appeal, plaintiffs attempt to distinguish *Swan*, but all of their arguments are unconvincing for the same reason—they do not meaningfully distinguish this case from *Swan*. *Swan* held that the plaintiff's decedent was not "readily identifiable as foreseeably endangered," meaning that, to distinguish *Swan*, plaintiffs need to show that XT was "readily identifiable as foreseeably endangered." While plaintiffs make a variety of arguments for why the facts of this case are different than the facts of *Swan*, none of those distinguishing facts explain why XT was readily identifiable as foreseeably endangered.

For instance, plaintiffs attempt to distinguish *Swann* by noting that "the resident in *Swan* had only been in the care of the Defendant for approximately one month prior to the events in the case," whereas, here, Rameau had been in defendant's care for several months. Plaintiffs also point out that this case is unlike *Swan* because Rameau "had a history of violence and aggression while she was residing at [defendant]," whereas LaPalm's violent history predated his stay at CMHD. Yet neither argument makes this case meaningfully distinguishable than *Swan* because neither of fact relied on by plaintiffs made XT "readily identifiable as being foreseeably endangered." Indeed, plaintiffs do not even offer an argument to support a different conclusion.[2]

---

[2] Moreover, plaintiffs' argument that LaPalm's violent history predated his stay at CMHD makes a distinction without a difference; the defendant in *Swan* was aware of LaPalm's violent history, just like defendant in this case was aware of Rameau's violent history. In both cases, however, a general history of violent behavior—none of which was directed at the victim—was insufficient to render the victim readily identifiable as being foreseeable endangered.

Plaintiffs also emphasize that Rameau was agitated immediately before the attack, but the same was also true of LaPalm. In fact, the situation in *Swan* was much worse. Here, Rameau only listened to music and left defendant's facility; she had not engaged in any violent behavior before she attacked XT. In contrast, the defendant in *Swan* was aware that LaPalm had "unsuccessfully tried to set fire to a truck and then a house using gasoline," and "[a]fterward, he went home and jumped out of a second floor window because he was depressed and wanted to hurt himself." *Id*. at 192-193. Plainly, LaPalm had engaged in far more troubling behavior before he attacked Washington than Rameau had in this case. Yet this Court in *Swan* still found that the decedent— who was residing with LaPalm at the time—was not "readily identifiable as being foreseeably endangered," despite LaPalm's recent behavior. *Id*. at 200 (quotation marks and citations omitted).

Plaintiffs next argue that "[u]nlike in *Swan*, Defendant's agent and employee watched these events play out in real time and took no action whatsoever." Once again, however, plaintiffs fail to explain how this made XT "readily identifiable as being foreseeably endangered." As just explained, Rameau's actions immediately before attacking XT were far less indicative of potentially violent behavior than LaPalm's actions were in *Swan*. Rameau listened to music, left defendant's facility unsupervised, and refused to return when prompted by Green—none of those actions made XT readily identifiable as foreseeably endangered, and the fact that Green was supervising Rameau at the time does not change this conclusion.

Plaintiffs also assert that, unlike in *Swan*, here "Defendant was engaged in active conduct, the supervision and treatment of [Rameau], which amounts to a duty it voluntarily assumed and was obligated to perform with reasonable care." It appears that, with this argument, plaintiffs are attempting to distinguish this case from *Swan* by arguing that defendant negligently ran its facility, which allowed Rameau to leave unsupervised and culminated in Rameau attacking XT. This still does not establish that defendant owed a duty to XT, however. Any duty defendant assumed by treating and caring for Rameau was not owed to XT. Defendant's treatment and care of Rameau created a special relationship between Rameau and defendant, and from this, defendant's duty to unknown third parties (such as XT) extended to third parties who were "readily identifiable as foreseeably endangered." *Swan*, 230 Mich App at 200, quoting *Jenks*, 219 Mich App at 421, quoting *Marcelletti*, 198 Mich App at 665 (quotation marks omitted). As repeatedly explained, plaintiffs have failed to put forth any evidence to suggest that XT was readily identifiable as foreseeably endangered.[3]

Finally, in a single paragraph, plaintiffs argue that their claims against defendant should survive because they also alleged that defendant was directly liable for negligently hiring, training, and supervising Green. Problematically, even assuming that defendant negligently hired, trained, and supervised its staff, plaintiffs fail to explain how this was a breach of a duty owed to *XT*, as defendant points out on appeal. By failing to explain how defendant negligently hiring, training, and supervising its staff was a breach of a duty that defendant owed to *XT*, the issue is abandoned. *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an

---

[3] More generally, we fail to see how this argument meaningfully distinguishes *Swan*. The defendant in *Swan* was actively treating LaPalm and was charged with his supervision when he attacked Washington.

appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."). Regardless, as explained throughout this opinion, the extent of defendant's duty to XT is governed by the well-established rule stated in *Swan*. For the reasons explained, plaintiffs have failed to proffer evidence establishing that defendant owed XT a duty based on that rule.

Turning to Jason's NIED claim, plaintiffs do not dispute that Jason's claim could not survive if XT's claim was dismissed, as the trial court reasoned. "When an appellant fails to dispute the basis of the trial court's ruling, [t]his Court . . . need not even consider granting plaintiffs the relief they seek." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) (quotation marks and citation omitted). Accordingly, we need not review plaintiffs' claim that the trial court erred by dismissing Jason's NIED claim.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly